*[General Term, October,* 1872.]

## W. AND R. MULLER *v.* THE CINCINNATI, HAMILTON AND DAYTON RAILROAD COMPANY.

Plaintiffs' agents, D. W. & Co., sent merchandise to the defendant, accompanied with the following bill of lading:

"Received, in good order, of Dinsmore, Wayne & Co., at the depot of the Cincinnati, Hamilton and Dayton and Dayton and Michigan Railroads, the articles marked or numbered as below, which are to be delivered

in like good order, at Detroit, Michigan, to W. & R. Muller, or assigns, he or they paying freight for the same at the rate of forty-five cents per hundred pounds. Cincinnati, April 23, 1866. Marks: W. & R. Muller, Detroit. Articles: Ten barrels liquor." Defendant's freight agent inserted the words, "Toledo for," between the words "at" and "Detroit," and sent it back to the consignees, who did not observe the alteration until after the loss of the property.

*Held,* that this insertion was a rejection, on the part of the railroad company, of the proposition of shipment of D., W. & Co., and the substitution of a counter-proposition to which D., W. & Co. are presumed to have assented by not dissenting within a reasonable time.

*Sage & Hinkle* and *Dunham & Foraker,* for plaintiffs.

*Matthews, Ramsay & Matthews,* for defendant.

HAGANS, J. The plaintiffs allege that the defendants are common carriers, having connections with railroads to Detroit, Michigan, and that on the 23d April, 1866, having before that purchased of Dinsmore, Wayne & Co., at Cincinnati, ten barrels of whisky of the value of $889.26, said Dinsmore, Wayne & Co., for the plaintiffs, delivered the same to the defendants, at Cincinnati, to be thence safely transported for hire and delivered to the plaintiffs, at Detroit, which they failed to do.

The defendants deny that the whisky was by them to be carried to and delivered at Detroit, and that it was lost by any default on their part. They allege, *first,* that their contract was to carry said goods to Toledo, Ohio, the terminus of their road, and there to deliver them to the Michigan Southern and Northern Indiana Railroad Company, to be by it carried to Detroit and to be there delivered to the plaintiffs, and that they performed their contract; and, *secondly,* that the goods were lost at Detroit on the 26th April, 1866, by the accidental burning of the depot.

It appears by the agreed statement of facts, that on the 23d April, 1866, Dinsmore, Wayne & Co. sent the whisky, by their drayman, to the depot of the defendants in Cin-

cinnati for transportation to Detroit. The whisky was marked, " W. & R. M., Detroit." When the whisky was sent to the defendants, Dinsmore, Wayne & Co. filled up and made out a bill of lading at their business house, and sent it by their drayman for signature, as follows: " Received, in good order, of Dinsmore, Wayne & Co., at the depot of the Cincinnati, Hamilton and Dayton and Dayton and Michigan Railroad, the articles marked or numbered as below, which are to be delivered in like good order, at Detroit, Michigan, to W. & R. Muller, or assigns, he or they paying freight for the same at the rate of 45 cts. per 100 lbs. Cincinnati, April 23, 1866. Marks: W. & R. Muller. Articles: 10 bbls. liquor."

The whisky was received at the depot by the freight agent of defendants, who interlined the bill of lading, after the words "in like good order at," with the words, " Toledo for," written in red ink, and then the agent signed it, and *immediately* forwarded the property. The plaintiffs had purchased the liquor of Dinsmore, Wayne & Co., and the shipment was on the plaintiff's account. It was placed in the defendants' car, which ran to Detroit, without transhipment, as follows: by the defendants, to Dayton, Ohio, thence to Toledo, Ohio, by the Dayton and Michigan Railroad, and thence to Detroit, by the Michigan Southern and Northern Indiana Railroad. Before the car was unloaded, or plaintiffs notified of its arrival, the depot at Detroit was accidentally destroyed by fire and the whisky lost. The statement shows the running arrangement between the roads. Among other things, it appears that freight was way-billed to Toledo only, and there rebilled by the Michigan Southern to Detroit. Dinsmore, Wayne & Co. frequently shipped by defendants' road, and had at their house printed blank bills of lading furnished by defendants (though a witness states that the blanks were bought at a bookstore), which it was their custom to bill out as occasion required, writing on them the destination, and to send for signature, with freight, to defendants' depot; and the bill of

lading in this case was one of these. Thus far the parties agreed on the facts, and as the other facts in the cause were disputed, testimony was taken as to them.

It appears that the drayman took with him a dray-ticket, which Dinsmore, Wayne & Co. had filled up. It stated that the goods were to be delivered at Detroit, and was signed by a receiving clerk. The drayman also took with him a book of blank bills of lading, one of which was filled up as stated, and two other loose blank bills of lading, filled up in the same way, to be signed by the freight agent at the depot, one to be retained by the defendants. Upon the surrender of the dray-ticket, the bills of lading were altered and signed, two of them returned by the drayman to the shippers. One of these was retained by Dinsmore, Wayne & Co., and the other forwarded to the plaintiffs. Dinsmore & Denny, both members of the firm of Dinsmore, Wayne & Co., state that the interlineation escaped their observation, until after the loss, and that it was made without their knowledge and consent. Denny states it was their " customary practice " to examine their bills of lading after they had been signed and brought back to their house. They attach to their testimony twenty bills of lading filled up in the same way and without any interlineation for shipment over defendants' road, to various points beyond or off their line, and on the lines of connecting roads. Four of these only are to Detroit, and of these, three are dated in 1867, and one in 1864. Of these twenty bills twelve are dated in 1867, two in 1864 and six in 1865. A. R. Lafferty, the freight agent, states it was the custom of the defendant to limit their responsibility to their own road, and that this interlineation was made to notify the shippers of the limitation.

The cause came on for trial, the evidence was all taken, the cause was reserved, and the testimony certified to the General Term for the opinion of all the judges.

The principal, and indeed the only question presented by this record is, what was the contract between the parties?

The plaintiffs must be held to be bound by the acts of Dinsmore, Wayne & Co. The bills of lading filled up by them for signature by the proper officer of the defendants, was a mere proposition for a contract to transport this property to Detroit. And if it was, in fact, accepted by the defendants, they must be held liable for this loss, as the contract contains no restrictions upon the liability of the carrier. If, on the other hand, we hold that the defendants refused an acceptance of the shipper's proposition, as contained in the bills of lading filled out by them, but made a counter-proposition by the insertion of the words "Toledo for," in red ink, thus restricting their liability to a safe transportation and delivery at that point, which they accomplished, and the consignors accepted the counter-proposition, or assented to it, and the goods went forward on the contract thus made, the defendants must have judgment. *Pontius, etc.* v. *Cincinnati, Hamilton and Dayton Railroad Company*, 19 Ohio St. 221. We attach no importance to the fact, that the defendant's receiving clerk signed the dray-ticket. He had no power to make a contract of shipment. His act was nothing more than receiving the goods, on the proposition of the consignors. There was no acceptance on a contract to carry. The goods were still subject to whatever contract might be evidenced by the bills of lading. These unsigned bills were sent by the drayman for signature, and were altered and signed before any actual shipment; but no one was sent along to ascertain whether the company would accept the proposed shipment, or to accept the new terms offered by the company. The change in the proposition was made in red ink, which strongly contrasts with the body of the writing and print, which is in black ink. The change was made before the receipt of the goods or any contract for shipment was consummated. Without delay, the altered and signed bills were returned to the consignors. It is not improbable that, according to their custom, they did examine the bills of lading. If so, and they did not assent to the contract as signed, they should have notified the

defendants at once. In that case, if the goods had been shipped, the defendants might have been liable for the loss. If not shipped, the consignors might have refused to consummate the contract as proposed by the company, and taken possession of their property. By the agreed statement of facts, it appears that "immediately" on signing the bills of lading the goods were shipped. It would seem from this language that no time was given for the assent of the shippers to the change in the bills. But we do not think that we are so literally to understand it. It was undoubtedly meant that the goods were forwarded in such prompt time as would excuse the carrier for not shipping sooner. Indeed, the dates of the shipment and arrival at Detroit are conclusive on this point.

The evidence nowhere discloses any express assent—indeed, no assent at all, unless it be the assent which the law presumes, under all the facts and circumstances of the case. See *Jordan* v. *Norton*, 4 M. & W. 154. It would be natural and business-like that the consignors should at least see that the bills were signed. They state it was their custom to examine their bills. If they had done so, in this instance, the interlineation could have hardly escaped their attention; and there is nothing in the evidence, relating to the course of business between the parties, or the frequency or extent of the shipments, that would amount to an excuse for the omission. If purposely omitted, the plaintiffs can hardly complain, nor ought they to be allowed to do so, if the omission was through carelessness. The very nature of the transaction was such as to charge the consignors with knowledge of the contract; and receiving it without dissent, they are to be presumed to know that it contained the terms on which the property was to be transported. It is incumbent on the plaintiffs to show that there was a dissent in a reasonable time, at least. Nothing of the sort appears in the testimony, and no fraud is alleged or proved. In these respects, a bill of lading differs from the class of cases to be found in the books of printed notices limiting the

liability of the carrier, of which *Blossom* v. *Dodd*, 43 N. Y. 264; *The Southern Express Co.* v. *Moon*, 39 Miss. 822, and *Adams Express Co.* v. *Nock*, 2 Duvall, 562, are instances. Indeed, this is not a case of the limitation of the carrier's responsibility, but a question as to what was the contract between the parties.

The principle of the case of *Van Toll* v. *The S. E. Railway Co.*, 104 E. C. L. 75, although a bailment applies with great force here. The plaintiff had deposited goods for safe-keeping, part of which were afterward lost, and received a printed receipt or ticket containing the contract, which stated there should be no liability exceeding £10 in value. Besides, a notice to the same effect was posted conspicuously, but there was no proof that the plaintiff read either the notice or the ticket; in fact, she did not read the notice. The court held that there was an assent to the terms of the bailment. "If," said Mr. Justice Byles, "the party chooses to put it?"—the receipt—"in his pocket, though he does not know one word it contains, it seems to me he assents to it implicitly, whatever its terms may be, on two conditions." One of these was that the terms should be reasonable, and the other plain and obvious.

In *Grace* v. *Adams, etc.*, 100 Mass. 505, it was held that the receipt without dissent, by a consignor, of a bill of lading by which the carrier stipulates against liability for loss by fire, discharges the carrier for such a loss, not caused by his negligence, and evidence is not admissible, in the absence of fraud, to show that the consignor did not read the terms of the bill of lading delivered to him by the carrier.

In the case at bar, the consignor had no right to take it for granted that the defendant would accept the proposed terms of the shipment. Negotiations between consignors and carriers as to the terms of the carrier's contract, are as common as in other cases. And when the bills of lading were delivered to the consignors, and accepted without reading them, and without dissent communicated to the

defendants in a reasonable time, they had the right to infer the assent of the shippers. The shippers knew that the bill of lading contained the terms of the contract, and the law presumes, in the absence of fraud or imposition, that the shipper read it, or was willing to assent to its terms without reading it. And the defendants have the right to the protection of the obligations they assumed, and are not to be deprived of it by the willful or negligent omission of the consignors to read the contract. It will not do to allow a party to deny knowledge of the contents of a contract, after he has made it, by showing that he did not read it. In the absence of fraud, he is conclusively presumed to understand its terms and legal effect. *Rice* v. *Dwight Manufacturing Co.* 2 Cush. 80.

This application of the principles stated, is fully justified by Mr. Parsons, in vol. 1, p. 476, of his work on Contracts, where he treats of the assent of the parties to a contract. There is no substantial reason why there might not be objections made to the rate at which the defendants agreed to carry this property, as well as to any of the other terms of the contract, upon the grounds claimed by the plaintiffs.

On the whole case, we think judgment should be rendered for the defendant.